**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| TERRI M. PRETTYMAN ) <br> 9926 Blake Lane ) <br> Oakton, Virginia  22124 ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> LTF CLUB OPERATIONS COMPANY, INC. ) <br>  d/b/a LIFE TIME FITNESS ) <br> 2902 Corporate Place ) <br> Chanhassen, Minnesota  55317 ) <br> ) <br> Serve:  Cogency Global, Inc. ) <br> Registered Agent ) <br> 250 Browns Hill Court ) <br> Midlothian, Virginia  23114 ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. _____  1:18-cv-122-TSE/IDD |

**COMPLAINT**

COMES NOW THE PLAINTIFF, TERRI M. PRETTYMAN, by counsel, and moves this

Court for entry of judgment in her favor, and against the Defendant, LTF CLUB OPERATIONS

COMPANY, INC. d/b/a LIFE TIME FITNESS, and in support of such motion alleges and avers

as follows:

**NATURE OF ACTION**

1.      This action states a claim for discrimination under the Age Discrimination in

Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34 (the "ADEA"), discrimination based

on Plaintiff's religion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e,

*et seq.*, and retaliation, including termination, in violation of both the ADEA and Title VII of the Civil Rights Act of 1964 after Plaintiff complained about discrimination.

## PARTIES

2.     Plaintiff Terri M. Prettyman ("Ms. Prettyman") is a resident and citizen of Fairfax County in the Commonwealth of Virginia and at all times relevant hereto, was employed by LTF Club Operations Company, Inc. d/b/a Life Time Fitness, in this judicial district.

3.     Ms. Prettyman is currently 58 years of age.  At all times relevant to these claims, Ms. Prettyman was more than 40 years of age.

4.     Ms. Prettyman was an "employee" of LTF Club Operations Company, Inc. d/b/a Life Time Fitness, within the meaning of 42 U.S.C. § 2000e(f) and an "eligible employee" of LTF Club Operations Company, Inc. d/b/a Life Time Fitness, within the meaning of 29 U.S.C. §2611(2)(A).

5.     LTF Club Operations Company, Inc. d/b/a Life Time Fitness ("Life Time Fitness") is an "employer" within the meaning of 42 U.S.C. §2000e(b) and 29 U.S.C. §2611(4)(A).

6.     Life Time Fitness is a foreign corporation, registered with the Virginia State Corporation Commission as an active corporation in good standing, and which maintaining an agent for the service of process in the Commonwealth of Virginia.

7.     Life Time Fitness is engaged in an industry affecting commerce and has had more than 15 employees in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 42 U.S.C. § 2000e(b).

2

8.   Life Time Fitness is engaged in an industry affecting commerce and has had more than twenty employees for each working day in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 29 U.S.C. § 2611 (4)(A).

## JURISDICTION AND VENUE

9.   The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

10.   The causes of action alleged in this action arose in this judicial district, in the City of Fairfax, in the Commonwealth of Virginia.

11.   This Court has jurisdiction over Ms. Prettyman's claims under the ADEA pursuant to 29 U.S.C. § 626(c)(1).

12.   Jurisdiction and venue are proper in this Court.

## PROCEDURAL STATUS

13.   Ms. Prettyman timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on June 21, 2017.

14.   The EEOC issued a Right to Sue on December 28, 2017.

15.   This action is timely filed.

## BACKGROUND

16.   Ms. Prettyman began her employment with Life Time Fitness, Inc. ("Life Time") in February 2008 as a Group Fitness Instructor and Instructor Mentor at the Fairfax (Main Street) location.

17.   Life Time Fitness is a chain of fitness centers operating throughout the United States and Canada.

18.     Prior to her employment at Life Time Fitness, Ms. Prettyman was a Program and Group Fitness Manager at Sport and Health Clubs for six years, and a Group Fitness Director and Club Manager at McLean Racquet and Health Club for three years before that.

19.     Ms. Prettyman is a Certified Group Fitness Instructor and am AFAA (Athletics and Fitness Association of America) certified in Pilates, spin, fitness and strength, nutrition science, human anatomy, lifestyle and weight management.  Ms. Prettyman is also certified in CPR and AED (Automated External Defibrillator).

20.     At all times during her employment, Ms. Prettyman performed her job duties in an exemplary manner, as evidenced by her advancement and the feedback she received from club members.  In 2008, Ms. Prettyman started by teaching one class each week, and that number increased steadily.  In 2013, Ms. Prettyman was approached by the then-Area Director who asked if she would be interested in taking on the studio manager role (a job Ms. Prettyman had previously held at Sport and Health for six years).

21.     On October 21, 2013 Ms. Prettyman was promoted to the position of Group Fitness Department Head the Fairfax, Virginia Life Time Fitness location, and she held this position at the time of her termination.  Ms. Prettyman's job title was changed to Studio Manager in early 2016, but her job responsibilities remained the same.

22.     As the Department Head, Ms. Prettyman ensured the success of the Group Fitness Program by scheduling and monitoring close to 80 classes per week (*i.e.,* all strength, conditioning, Pilates, kickboxing, barre, sculpting, cycling, core/abs, etc.).  Other responsibilities included communication of all Group Fitness news and information to members via email, signage and announcements; responding to member surveys and implementing changes; ensuring fitness instructors provide proper education and challenging workouts to participants; preparing

daily participation reports; completing monthly inventories, business plans and weekly objectives; maintaining clean, safe and hygienic studio conditions; and training, recruiting, auditioning, assessing and counseling Group Fitness team members.

23.    Ms. Prettyman was also required to teach four classes each week, observe ten classes, and participate in an additional five classes per week.  Ms. Prettyman worked 45+ hours each week.

24.    At the time of her termination, Ms. Prettyman was the oldest Department Head at the Fairfax Club, and one of the oldest (if not the oldest) in the Region overall.

25.    As Group Department Head, Ms. Prettyman's immediate supervisor was Devin Nickerson, ("Mr. Nickerson") the General Manager of the Fairfax location.  Mr. Nickerson is in his early 30s.

26.    In May 2015, the Fairfax club underwent a Club Improvement program to enhance club performance.  A corporate Club Improvement Specialist, Megan Richter ("Ms. Richter"), was on location in Fairfax for several months.

27.    While in the area, Ms. Richter visited other clubs as well.  While at the Centreville location, Ms. Richter was informed by a Centreville employee that "something weird" was going on between Mr. Nickerson and the Member Services Department Head.  When Ms. Richter questioned Ms. Prettyman and the other Department Heads about it, they each declined to comment.  However, Mr. Nickerson summoned Ms. Prettyman to his office and accused her of informing Ms. Richter that that he was having an affair with the other Department Head.  Ms. Prettyman was shocked, and assured him that she had not.  Mr. Nickerson refused to believe Ms. Prettyman, and yelled at her in a threatening manner, "You know what you did, and that was a very bad move on your part!"  After that, he spread the rumor to all Department Heads

5

in our Club that Ms. Prettyman was the one who had reported him, and he continued to treat Ms. Prettyman in a disrespectful, hostile, condescending and verbally abusive manner.

28.     Approximately one month later, Mr. Nickerson found out that Ms. Prettyman was *not* the one who had alerted management to his affair, but never apologized.  When Ms. Prettyman complained to Ms. Richter about Mr. Nickerson's retaliatory treatment of her based on his unfounded and false belief that Ms. Prettyman had reported him, he was counseled for his behavior, but no other action was taken.

29.     Ms. Prettyman was married on November 8, 2015.  After her wedding, in mid to late November 2015, Mr. Nickerson commented, "You don't have to work.  You have that big house in Oakton that you bought with all of that Jewish money."  Ms. Prettyman was visibly appalled, yet Mr. Nickerson did not apologize or recant his statement.  Mr. Nickerson had made previous statements to Ms. Prettyman about her "big house."

30.     Another time, during a conference call with Mr. Nickerson and her then-Group Fitness Area Lead for the Mid-Atlantic Region, Jennifer Lucas, Ms. Prettyman informed Mr. Nickerson she would be absent from work for the Jewish holidays.  Mr. Nickerson treated her request as a vacation request.  He also asked if Ms. Prettyman had received a trust fund from her parents.  Mr. Nickerson's comments were extremely offensive, disrespectful and upsetting, especially when made in the presence of her Regional Area Lead, who Ms. Prettyman respected, and who Ms. Prettyman wanted to respect her.

31.     Ms. Lucas was appalled by Mr. Nickerson's blatantly discriminatory comments to Ms. Prettyman.  After the conference call ended and Ms. Prettyman had returned to her office, Ms. Lucas called Ms. Prettyman and suggested she report what had transpired to HR.  Ms.

Prettyman told Ms. Lucas she was hesitant to create a lot of drama, which would only fuel Mr. Nickerson's discriminatory, hostile and insensitive treatment of her.

32.     On several occasions during Department Head meetings when Ms. Prettyman raised her hand to contribute, Mr. Nickerson, in the presence of her colleagues, rolled his eyes, looked at Ms. Prettyman, and said "What now?"  Mr. Nickerson's conduct was meant to, and did, demean and belittle Ms. Prettyman in the eyes of her colleagues, both because Mr. Nickerson believed Ms. Prettyman was too old to be a fitness instructor, and because he was aware that Ms. Prettyman had reported his treatment of Ms. Prettyman to Ms. Richter.

33.     Mr. Nickerson has also made references to Ms. Prettyman's age in the meetings, calling Ms. Prettyman "as old as the hills" on several occasions.  Ms. Prettyman is currently 58 years old.  The oldest Department head, after Ms. Prettyman, is 42.  The others are all in their late 20s or early 30s.  When Ms. Prettyman complained to Mr. Nickerson that his comments were demeaning and inappropriate, he offered an empty apology and promised to watch what he said.  Nothing changed.

34.     Mr. Nickerson also compared Ms. Prettyman to his "pain in the ass mother" several times throughout her employment, also in reference to her age.

35.     In September 2016, during a conference call with Mr. Nickerson and the Group Fitness Regional Lead, Jennifer Lucas, Mr. Nickerson said to Ms. Prettyman, "Terri, you don't need this job, you have all of that Jewish money." He then asked where "all the Jewish money came from." Ms. Prettyman told Mr. Nickerson that his comment was inappropriate and that she did not appreciate him making such inappropriate comments to her.

36.    Mr. Nickerson's comment took Ms. Prettyman completely off guard, and Ms. Prettyman found it offensive and discriminatory, as well as completely inappropriate and unprofessional.

37.    Mr. Nickerson has made derogatory comments about several female instructors. For instance, Mr. Nickerson made no secret of the fact that he did not like the Saturday instructor, referring to her as "old and boring," even though her class routinely had 28-30 participants.

38.    Mr. Nickerson also complained about another, older instructor who he said was overweight, stating that her class was also "boring," because the instructor was slow and did not turn the music up loud enough.  Notably, Mr. Nickerson had never taken the class, which routinely had 35-40 participants, a number considered good by Life Time.

39.    In June 2016, after the end of a regularly scheduled Wednesday meeting, Ms. Prettyman approached Mr. Nickerson to discuss an issue with the sound system in a studio, which had been broken for three weeks, and the pool sound system had been out of operation for almost three months.  Both Mr. Nickerson and Ms. Prettyman had received several complaints from members and instructors.  In response, Mr. Nickerson became defensive and screamed at Ms. Prettyman to speak with the Operations Director.  When Ms. Prettyman explained that she had been reaching out to the Operations Director for the past several weeks, to no avail, he continued screaming and accused Ms. Prettyman of going over the heads of her peers.  There were several Department Heads still in the room.  Ms. Prettyman was upset and humiliated by Mr. Nickerson's treatment of her, especially in the presence of her colleagues, which was meant to, and did, demean and belittle Ms. Prettyman in the eyes of her peers.

40.     Ms. Prettyman left the club and called Florideo Passarelli ("Mr. Passarelli"), Area Director of the Mid-Atlantic Region, and told him what had transpired. Mr. Passarelli told Ms. Prettyman to go home, and assured her that he would "take care of it." During the next few hours, Mr. Nickerson attempted to call Ms. Prettyman five times. When Ms. Prettyman finally picked up the fifth call, Mr. Nickerson accused her of abandoning her job, and said it was a "terminable action." He was extremely angry, even though Ms. Prettyman explained that she had been instructed by Mr. Passarelli to go home. Later that afternoon, Mr. Passarelli called, apologized for Mr. Nickerson's behavior, and told Ms. Prettyman to take a few days off. When Ms. Prettyman returned to work, Mr. Nickerson apologized, saying that he had been "emotionally hijacked" because he and his wife were having issues with their sex life. Even Mr. Nickerson's attempt at an apology contained inappropriate and unprofessional comments, intended to make Ms. Prettyman uncomfortable in her workplace.

41.     In February 2017, Ms. Prettyman suffered an ankle injury, initially thought to be a stress fracture (and later diagnosed as a heel spur combined with plantar fasciitis), and per doctor's orders, was unable to teach class for three weeks. Ms. Prettyman reached out to Mr. Nickerson and the Mid-Atlantic Group Fitness Lead, Nichol Young ("Ms. Young"), who in turn reached to Mr. Passarelli, and it was agreed that Ms. Prettyman could continue working (but not teaching). Ms. Prettyman was told to stay home for the day, and received permission to do some work from home. Ms. Young stated that Mr. Passarelli would inform Mr. Nickerson of that directive. Ms. Prettyman then received a call from Mr. Nickerson accusing her of being absent from work without permission. Mr. Nickerson was furious and said that Ms. Prettyman would be charged PTO for the day. When Ms. Prettyman complained to Mr. Passarelli, all he said was, "we've been through this with [Mr. Nickerson] before, and there is nothing I can do."

42.     The permission to work at home was subsequently rescinded, and Ms. Prettyman was faced with either being in the club for her normal hours on her injured ankle, or taking leave without pay.  Despite her doctor's orders to stay off her foot as much as possible, Ms. Prettyman went to work daily and used subs to teach her classes.

43.     On March 4, 2017, Ms. Prettyman had coordinated a special yoga event between the Studio and the Spa.  The Spa Director, who was responsible for providing two massage therapists for the event, did not show up.  One massage therapist had called in sick, but this was not communicated to Ms. Prettyman.  Ms. Prettyman attempted to contact Mr. Nickerson throughout the day (the event was to begin at 6 PM), to no avail.  When Ms. Prettyman arrived to set up the social part of the event in the Café, Ms. Prettyman was told by Café staff that Mr. Nickerson had not approved her use of the Café.  This was false.  When the Café employees called their Department Head, the Department Head attempted to force Ms. Prettyman to move the event to another location.  Ultimately, the event occurred, but Ms. Prettyman was forced to clean the dirty Café, assisted only by Mr. Nickerson's mother, so it would be useable.  Ms. Prettyman continued to call and text Mr. Nickerson, and he never responded.

44.     On Thursday, March 9, 2017, Ms. Prettyman attended a regularly scheduled meeting with Mr. Nickerson.  Just before the meeting, Ms. Prettyman had read the most recent "Dashboard" review (how the Club is rated by its members), and Ms. Prettyman excitedly told Mr. Nickerson that the Club was in the top 20% corporate wide for both Yoga and Cycle, and in the top 50% for Group Fitness.  In contrast, the Fairfax club as a whole received a Net Promoter Score (NPS) ranking it 120 out of 122 clubs overall.

45.     Rather than concede this as a compliment to Ms. Prettyman and her Department, Mr. Nickerson responded, "Don't pat yourself on the back, you have a ton of work to do," and

said Ms. Prettyman was "nowhere close" to where she needed to be.  Fairfax is a smaller club with only two studios, as compared to other clubs with four or five studios.  The fact that the Fairfax club was still ranked so highly for Yoga and Cycle, and for Group Fitness, was a significant accomplishment.

46.     During the meeting, Ms. Prettyman brought up the incident wherein Mr. Nickerson did not communicate his approval of the yoga-spa event/café usage to the proper staff. In response, Mr. Nickerson yelled, "THAT WAS YOUR FAULT!"  Ms. Prettyman was shocked, since they had discussed the plans and he had approved them.

47.     Mr. Nickerson then called Ms. Prettyman a "drama queen" and said "her peers" did not like working with her.  When Ms. Prettyman pressed for a example, he said Bridget Murphy (Fitness Kids Club Director), Stormie Blackburn (Member Services) and other Department Heads intentionally omitted Ms. Prettyman from group texts because Ms. Prettyman create drama.  Ms. Prettyman found this hard to believe since Ms. Prettyman had a very good working relationship with Bridget Murphy, who, when asked, confirmed that Mr. Nickerson's statement was false.

48.     At that point, Ms. Prettyman was extremely upset and frustrated, and told Mr. Nickerson that she felt she was being forced to resign and would have to consider resigning because of his hostile and abusive conduct towards her.  Before Ms. Prettyman could continue, Mr. Nickerson quickly said, "I gladly accept your resignation."

49.     After this heated exchange, Ms. Prettyman went to her office and called Jorge (George) Hernandez ("Mr. Hernandez"), the Senior General Manager/Mr. Nickerson's supervisor, who runs the Life Time in Reston, Virginia.  Mr. Hernandez suggested Ms.

11

Prettyman "catch her breath and go home," and assured Ms. Prettyman he would speak to Mr. Nickerson.

50.     The following day, Friday, March 10, 2017, Ms. Prettyman called Mark Savage ("Mr. Savage"), HR Specialist at Life Time Fitness Corporate headquarters in Minnesota.  Mr. Savage, who had already aligned himself with Mr. Nickerson after hearing Mr. Nickerson's "story," was unsupportive and unprofessional and spoke to Ms. Prettyman in an aggressively accusing manner.  This was not Mr. Savage's first indication of the inappropriate manner in which Mr. Nickerson treated Ms. Prettyman throughout her employment, as Ms. Prettyman had previously emailed Mr. Savage on several occasions alerting him to unprofessional and discriminatory statements made to be her Mr. Nickerson, but he never responded.  Ms. Prettyman told Mr. Savage that because Life Time had consistently and continuously failed to address her complaints, and had not attempted to remedy the discriminatory and illegal treatment to which Ms. Prettyman was being subjected, and that Ms. Prettyman was considering filing a lawsuit to protect herself.

51.     Also on Friday, Ms. Prettyman received a text message from Mr. Hernandez asking to meet with her, and he followed up by text on Saturday, March 11, to arrange an in-person meeting on Monday, March 13, 2017, at his club in Reston.  Because Ms. Prettyman was so upset and emotional, she wrote a letter to Mr. Hernandez outlining the incidents she wanted to discuss with him.  These included:

- Mr. Nickerson continuously belittling Ms. Prettyman in front of her peers;

- Mr. Nickerson making frequent and discriminatory comments about Ms. Prettyman's "large house," and her not needing to work because of her "Jewish money;"

12

- Mr. Nickerson making frequent and discriminatory comments about Ms. Prettyman's age in the presence of her colleagues;

- Mr. Nickerson making unfair assessments about certain instructors based on their age; and

- Mr. Nickerson's general belittling, demeaning, inappropriate, unprofessional, disrespectful and discriminatory treatment of Ms. Prettyman, which encouraged and condoned others to disrespect and mistrust Ms. Prettyman.

52.     On Monday, March 13, 2017, when Ms. Prettyman arrived at the meeting in Reston, Mr. Savage was conferenced in by phone. Mr. Savage immediately and abruptly stated that since he could not corroborate Ms. Prettyman's "story," that March 13 was her last day of employment. He further stated that Ms. Prettyman could no longer teach classes, she would be paid for two weeks, her health insurance would be cut off, her husband could no longer be a member, and her husband and daughter were prohibited from joining the club as members in the future. Mr. Hernandez was then instructed to escort Ms. Prettyman out. Although Ms. Prettyman had presented her letter to Mr. Hernandez at the meeting, she was never given the opportunity to address any of the listed topics.

53.     Ms. Prettyman reiterated that she did not really want to resign and asked if she was being fired. Mr. Savage repeated that Ms. Prettyman had resigned. If she had resigned, Ms. Prettyman would not have been escorted off the premises, her husband and daughter would not be banned from the club, and Ms. Prettyman would have been allowed to work out her two weeks, especially in light of the fact that the email sent out by Mr. Nickerson announcing that Life Time and Ms. Prettyman had "parted ways" also said, "…with Terri out, we have several classes that need filling/coverage, effective immediately …" Mr. Savage also stated that if Ms. Prettyman needed to collect personal items from her locker, she would have to be escorted in order to do so.

54. While he was escorting Ms. Prettyman out, Mr. Hernandez expressed his regret, said he felt "terrible," called the situation "unfortunate," and said that Mr. Nickerson was still under investigation for the incident. Nevertheless, Life Time chose to terminate Ms. Prettyman, an older, Jewish female, instead of Mr. Nickerson, a male under 40 years of age, even while Mr. Nickerson was still under investigation.

55. At that point when Ms. Prettyman asked Mr. Hernandez if Life Time was terminating her employment, and he unequivocally answered, "Yes."

56. Ms. Prettyman's employment was terminated just two days after she engaged in the protected activity of complaining to Mark Savage (again) about the illegal and discriminatory treatment, and after she pointed out Life Time's failure to address or remedy the situation and said that she was considering filing a lawsuit to protect herself.

57. In addition to her complaints to Mr. Savage, Mr. Passarelli, and Mr. Hernandez, Ms. Prettyman reported and complained about Mr. Nickerson's inappropriate, unprofessional, hostile and illegal treatment of her on several occasions to Tara Egan, Corporate HR Specialist (and in particular, his yelling and ranting at Ms. Prettyman, his refusal to accommodate her foot injury, and his "acceptance" of a resignation Ms. Prettyman never offered), and to Michael Putnam, Area Director. No action was taken by Ms. Egan, Mr. Putnam, or anyone else in response to Ms. Prettyman's complaints.

58. After her termination, on March 13, 2017, Mr. Nickerson sent out an email informing all Fairfax employees that Life Time Fitness and Ms. Prettyman had "parted ways," and commenting, "I know this may come as a shock to some of you, but it is important that we continue to focus on what is important . . ."

14

59.    In early April, 2017, Ms. Prettyman exchanged text messages with Megan Richter, the Corporate Improvement Specialist who had worked with the club in 2015.  When Ms. Prettyman told Ms. Richter she was no longer at Life Time, she responded, "Did you quit because of him [?]"  Ms. Prettyman responded that she had been abruptly fired, with no warning.

60.    On April 2, 2017, Ms. Prettyman had the following text message exchange with Stormie Blackburn, Member Services Department Head.

> TP:  . . . I just wanted to let you know how deeply personal I took the news from Devin that you didn't want to work with me …
>
> SB:  I never said that about you.  I was hurt that you thought that. Everything happened so fast.
>
> TP:    Devin told me point blank that the team didn't like me and that no one wanted to work with me.  He said that was why I was never included in group texts.
>
> SB:    The "team"
>
> TP:    He specifically said you Bridget and Erin
>
> SB:    I don't know why he said that.  I can assure you that I would never say anything mean behind your back.  You have helped me with my growth here and have always supported me inside and outside of work. You are my friend.

61.    Ms. Prettyman loved her job at Life Time Fitness, and thrived on providing excellent service and developing positive and productive relationships with the Club's members and her team of instructors.  The positive feedback Ms. Prettyman received from members and her team is the reason for her longevity at Life Time.

62.    Ms. Prettyman was, and continues to be, devastated and disappointed that her complaints and reports of illegal, discriminatory, hostile and retaliatory behavior to HR and other

managerial employees went unheeded, and no action was taken, which encouraged and allowed the behavior to continue.

63. Ms. Prettyman is currently 58 years old and had planned to work at Life Time until she retired. The illegal, discriminatory, hostile and retaliatory treatment to which Ms. Prettyman was subjected was entirely unjustified by her conduct and performance.

64. After her termination, Ms. Prettyman learned that her position was taken over, and she was replaced, by a significantly younger female employee.

65. Life Time has demonstrated a pattern and practice of discriminating against its older workers, referring to several as "old and boring," and singling out older instructors as those who do not fit the Life Time "brand."

66. Ms. Prettyman has never been given any satisfactory or true justification for her termination and has never received any substantive performance criticisms. Life Time was unable, and did not, offer a satisfactory or credible reason for her termination, or attempt to justify its acts of discrimination.

## COUNT ONE -
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT DURING THE COURSE OF EMPLOYMENT IN VIOLATION OF THE ADEA

67. The foregoing allegations are incorporated as if realleged herein.

68. Life Time Fitness, through its agents and officers, discriminated against Ms. Prettyman on account of her age during the course of her employment. This discrimination was with respect to Ms. Prettyman's compensation, terms, conditions, and privileges of employment, and constituted violations of the Age Discrimination in Employment Act of 1967, as amended

16

69.    Throughout Ms. Prettyman's employment, Mr. Nickerson, in particular, treated Ms. Prettyman in a disparate and discriminatory manner based upon her age.  His conduct was condoned and ratified at the highest levels of Life Time Fitness, when no remedial action was taken in response to Ms. Prettyman's complaints.

70.    On several occasions during Department Head meetings, when Ms. Prettyman attempted to contribute, Mr. Nickerson, in the presence of her colleagues, rolled his eyes, looked at Ms. Prettyman, and said "What now?"  Mr. Nickerson's conduct was meant to, and did, demean and belittle Ms. Prettyman in the eyes of her colleagues, because Mr. Nickerson believed Ms. Prettyman was too old to be a fitness instructor.

71.    Mr. Nickerson has also made references to Ms. Prettyman's age in Wednesday meetings, calling Ms. Prettyman "as old as the hills" on several occasions, and comparing Ms. Prettyman to his "pain in the ass mother" several times throughout her employment, also in reference to her age.

72.    Mr. Nickerson also made derogatory age related comments about other female instructors, referring to one as "old and boring," and calling another older instructor "overweight" and "boring" because the instructor was slow and did not turn the music up loud enough for Mr. Nickerson's liking.  Both of these instructors regularly had classes filled to capacity.

73.    Mr. Nickerson also commented that the Club's instructors, "for the most part were OK" but that several were not "the Brand."  By "brand," Ms. Prettyman understood Mr. Nickerson to be referring to young, attractive instructors (especially since he had previously complained that others were "old and boring" and/or overweight).

17

74. Ms. Prettyman complained about the discriminatory conduct on several occasions, including to Mr. Nickerson himself (calling him out on his unprofessional, discriminatory and inappropriate "old as the hills" comment made in the presence of Ms. Prettyman's colleagues), Megan Richter, Florideo Passarelli, Jorge Hernandez and Mark Savage, but no effective, remedial action was taken.

75. Life Time Fitness has engaged in a pattern and practice of age discrimination.

76. Ms. Prettyman was subjected to a hostile work environment and discriminated against in terms of her employment because of her age, and Life Time Fitness's discriminatory treatment of Ms. Prettyman violated the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34.

77. Life Time Fitness engaged in these discriminatory practices willfully, within the meaning of Section 7(b) of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626(b).

78. In discriminating against Ms. Prettyman in violation of federal law, Life Time Fitness's conduct was actuated by malice, spite and ill-will; was willful and wanton, and evinced conscious disregard for the rights of Ms. Prettyman.

79. As a direct and proximate result of this discrimination, Ms. Prettyman has suffered and continues to suffer injury including past and future loss of income and benefits of employment, other past pecuniary losses, future pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses, and other injury.

80. Due to the severity and knowledge of Defendant's conduct, Ms. Prettyman is also entitled to liquidated damages.

18

**COUNT TWO**
**DISCRIMINATION AND HOSTILE WORK ENVIRONMENT DURING**
**THE COURSE OF EMPLOYMENT IN VIOLATION OF TITLE VII**

81.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

82.     Life Time Fitness discriminated against Ms. Prettyman and subjected Ms. Prettyman to a hostile work environment because of her religion (Jewish).

83.     After Ms. Prettyman was married in November 2015, in mid to late November 2015, Mr. Nickerson commented, "You don't have to work.  You have that big house in Oakton that you bought with all of that Jewish money."

84.     Another time, during a conference call with Mr. Nickerson and then-Group Fitness Area Lead for the Mid-Atlantic Region, Jennifer Lucas, Ms. Prettyman informed Mr. Nickerson she would be absent from work for the Jewish holidays.  Mr. Nickerson treated her request as a vacation request, rather than a religious observance.

85.     On the same conference call, Mr. Nickerson also asked if Ms. Prettyman had received a trust fund from her parents.

86.     Ms. Lucas was appalled by Mr. Nickerson's blatantly discriminatory comments to Ms. Prettyman, and followed-up with a private call suggesting that Ms. Prettyman report Mr. Nickerson's conduct to HR.

87.     In September 2016, during another conference call with Mr. Nickerson and Jennifer Lucas, Mr. Nickerson said to Ms. Prettyman, "Terri, you don't need this job, you have all of that Jewish money." He then asked where "all the Jewish money came from."

19

88.     Other employees, who were not Jewish, were not subjected to similar treatment, including comments regarding the size of the homes, how much money they had, trust funds, where the money came from, or suggestions that they did not need their job based on their religious affiliation.

89.     Life Time Fitness's discriminatory treatment of Ms. Prettyman violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

90.     In discriminating against Ms. Prettyman in violation of federal law, Life Time Fitness evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Prettyman.

91.     As a direct and proximate result of Defendant's actions, Ms. Prettyman has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, depression, anxiety, stress, fearfulness, stress and anxiety related to not being able to earn a living or find comparable employment in her chosen field, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

92.     Due to the conscious disregard for Ms. Prettyman's federally protected rights, and the severity of Life Time Fitness's conduct, Ms. Prettyman is also entitled to punitive damages.

## COUNT THREE –
## RETALIATION AND RETALIATORY DISCHARGE IN VIOLATION OF THE ADEA

93.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

94.    Ms. Prettyman was retaliated against, and ultimately terminated, in retaliation for her complaints about the discriminatory and hostile treatment to which she was subjected.

95.    Acts of retaliation included:

- Mr. Nickerson, in the presence of Ms. Prettyman's colleagues, rolling his eyes and asking in a derogatory manner, "What now?" when Ms. Prettyman attempted to contribute at meetings involving her Department, which was intended to, and did, demean and belittle Ms. Prettyman in the eyes of her colleagues, both because Mr. Nickerson believed Ms. Prettyman was too old to be a fitness instructor, and because he was aware that Ms. Prettyman had reported his retaliatory conduct Megan Richter after he falsely accused Ms. Prettyman of reporting him for having an affair with another Department Head;

- Failing to remedy his behavior after Ms. Prettyman complained to Mr. Nickerson about his age related comments to her during several meetings, including referring to her as "old as the hills" on several occasions, and instead, escalating his hostile treatment of Ms. Prettyman;

- Yelling and screaming at Ms. Prettyman and accusing her of going over the heads of her peers in attempting to have a sound system repaired, causing Ms. Prettyman distress and humiliation in the presence of her colleagues, which was meant to, and did, demean and belittle Ms. Prettyman in the eyes of her peers.

- Accusing Ms. Prettyman of job abandonment (telling her it is a "terminable action") when Ms. Prettyman went home at the instruction of Florideo Passarelli after complaining to Mr. Passarelli about Mr. Nickerson's behavior;

- Accusing Ms. Prettyman of being absent from work without permission and charging Ms. Prettyman PTO after Ms. Prettyman was instructed by Nichol Young to stay home for the day after an ankle injury ;

21

- Rescinding Ms. Prettyman's permission to work from home while recovering from her ankle injury and causing her to choose being in the club for her normal hours on her injured ankle, or taking leave without pay (Ms. Prettyman was forced to work normal hours in the Club despite her doctor's orders to stay off her foot as much as possible, since she could not afford to take leave without pay);

- Undermining and attempting to ruin Ms. Prettyman's Yoga/Spa event so that it would reflect poorly on her, causing Ms. Prettyman to scramble, understaffed, to ensure the event went forward;

- Falsely telling Ms. Prettyman that her peers did not like working with her, which was later confirmed to be false, in an effort to undermine Ms. Prettyman's confidence and force her to resign;

- Attempting to force Ms. Prettyman to resign by "accepting" a resignation she did not offer; and

- Terminating Ms. Prettyman's employment on Monday, March 13, 2017, after she complained to Mark Savage, the HR Specialist at Life Time Fitness Corporate headquarters in Minnesota on Friday, March 10, 2017, having her escorted from the building, cancelling her husband's Club membership, and banning her husband and daughter from ever being Club members, forever.

96.     Notably, Ms. Prettyman had previously emailed Mr. Savage on several occasions alerting him to unprofessional and discriminatory statements made to be her Mr. Nickerson, and Mr. Nickerson's retaliatory conduct towards her, but he never responded.  Ms. Prettyman told Mr. Savage that because Life Time had consistently and continuously failed to address her complaints, and had not attempted to remedy the discriminatory and illegal treatment to which Ms. Prettyman was being subjected.

97.     While he was escorting Ms. Prettyman out, Mr. Hernandez expressed his regret, said he felt "terrible," called the situation "unfortunate," and said that Mr. Nickerson was still under investigation.  Nevertheless, Life Time chose to terminate Ms. Prettyman, an older, Jewish female, instead of Mr. Nickerson, a male under 40 years of age, even while Mr. Nickerson was still under investigation.

22

98.     Ms. Prettyman's employment was terminated just days after she engaged in the protected activity of complaining to Mark Savage (again) about the illegal, retaliatory and discriminatory treatment, and after she pointed out Life Time's failure to address or remedy the situation and said that she was considering filing a lawsuit to protect herself.

99.     In addition to her complaints to Ms. Richter, Mr. Savage, Mr. Passarelli, and Mr. Hernandez, Ms. Prettyman reported and complained about Mr. Nickerson's inappropriate, unprofessional, hostile and illegal treatment of her on several occasions to Tara Egan, Corporate HR Specialist (and in particular, his yelling and ranting at Ms. Prettyman, his refusal to accommodate her foot injury, and his attempt to "accept" a resignation Ms. Prettyman never offered).  No action was taken by Ms. Egan or anyone else in response to Ms. Prettyman's complaints.

100.    This retaliation is in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34.

101.    This conduct by Life Time Fitness was actuated by malice, spite, and ill-will; was willful and wanton, and evinced conscious disregard for the rights of Ms. Prettyman.

102.    As a direct and proximate result of Defendant's actions, Ms. Prettyman has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, depression, anxiety, stress, fearfulness, stress and anxiety related to not being able to earn a living or find comparable employment in her chosen field, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities

23

and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

103.    Due to the severity of Defendant's conduct, Ms. Prettyman is also entitled to punitive damages.

## COUNT FOUR –
## RETALIATION AND RETALIATORY DISCHARGE IN VIOLATION OF TITLE VII

104.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

105.    Ms. Prettyman was vocal in her objections to Mr. Nickerson's discriminatory comments based on her religion.

106.    Ms. Prettyman was retaliated against, and ultimately terminated, in retaliation for her complaints about the discriminatory and hostile treatment to which she was subjected.

107.    Acts of retaliation included:

- Mr. Nickerson, in the presence of Ms. Prettyman's colleagues, rolling his eyes and asking in a derogatory manner, "What now?" when Ms. Prettyman attempted to contribute at meetings involving her Department, which was intended to, and did, demean and belittle Ms. Prettyman in the eyes of her colleagues, both because Mr. Nickerson believed Ms. Prettyman was too old to be a fitness instructor, and because he was aware that Ms. Prettyman had reported his retaliatory conduct Megan Richter after he falsely accused Ms. Prettyman of reporting him for having an affair with another Department Head;

- Failing to remedy his behavior after Ms. Prettyman complained to Mr. Nickerson about his age related comments to her during several meetings, including referring to her as "old as the hills" on several occasions, and instead, escalating his hostile treatment of Ms. Prettyman;

- Yelling and screaming at Ms. Prettyman and accusing her of going over the heads of her peers in attempting to have a sound system repaired, causing Ms. Prettyman distress and humiliation in the presence of her colleagues, which was meant to, and did, demean and belittle Ms. Prettyman in the eyes of her peers.

24

- Accusing Ms. Prettyman of job abandonment (telling her it is a "terminable action") when Ms. Prettyman went home at the instruction of Florideo Passarelli after complaining to Mr. Passarelli about Mr. Nickerson's behavior;

- Accusing Ms. Prettyman of being absent from work without permission and charging Ms. Prettyman PTO after Ms. Prettyman was instructed by Nichol Young to stay home for the day after an ankle injury;

- Rescinding Ms. Prettyman's permission to work from home while recovering from her ankle injury and causing her to choose being in the club for her normal hours on her injured ankle, or taking leave without pay (Ms. Prettyman was forced to work normal hours in the Club despite her doctor's orders to stay off her foot as much as possible, since she could not afford to take leave without pay);

- Undermining and attempting to ruin Ms. Prettyman's Yoga/Spa event so that it would reflect poorly on her, causing Ms. Prettyman to scramble, understaffed, to ensure the event went forward;

- Falsely telling Ms. Prettyman that her peers did not like working with her, which was later confirmed to be false, in an effort to undermine Ms. Prettyman's confidence and force her to resign;

- Attempting to force Ms. Prettyman to resign by "accepting" a resignation she did not offer; and

- Terminating Ms. Prettyman's employment on Monday, March 13, 2017, after she complained to Mark Savage, the HR Specialist at Life Time Fitness Corporate headquarters in Minnesota on Friday, March 10, 2017, having her escorted from the building, cancelling her husband's Club membership, and banning her husband and daughter from ever being Club members, forever.

108. Notably, Ms. Prettyman had previously emailed Mr. Savage on several occasions alerting him to unprofessional and discriminatory statements made to be her Mr. Nickerson, and Mr. Nickerson's retaliatory conduct towards her, but he never responded. Ms. Prettyman told Mr. Savage that because Life Time had consistently and continuously failed to address her complaints, and had not attempted to remedy the discriminatory and illegal treatment to which Ms. Prettyman was being subjected.

109. While he was escorting Ms. Prettyman out, Mr. Hernandez expressed his regret, said he felt "terrible," called the situation "unfortunate," and said that Mr. Nickerson was still under investigation. Nevertheless, Life Time chose to terminate Ms. Prettyman, an older, Jewish female, instead of Mr. Nickerson, even while Mr. Nickerson was still under investigation.

110. Ms. Prettyman's employment was terminated just days after she engaged in the protected activity of complaining to Mark Savage (again) about the illegal, retaliatory and discriminatory treatment, and after she pointed out Life Time's failure to address or remedy the situation and said that she was considering filing a lawsuit to protect herself.

111. In addition to her complaints to Ms. Richter, Mr. Savage, Mr. Passarelli, and Mr. Hernandez, Ms. Prettyman reported and complained about Mr. Nickerson's inappropriate, unprofessional, hostile and illegal treatment of her on several occasions to Tara Egan, Corporate HR Specialist (and in particular, his yelling and ranting at Ms. Prettyman, his refusal to accommodate her foot injury, and his attempt to "accept" a resignation Ms. Prettyman never offered). No action was taken by Ms. Egan or anyone else in response to Ms. Prettyman's complaints.

112. Ms. Prettyman was replaced by a significantly a female employee who, on information and belief, is not Jewish.

113. This retaliation is in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*.

114. This conduct by Life Time Fitness was actuated by malice, spite, and ill-will; was willful and wanton, and evinced conscious disregard for the rights of Ms. Prettyman.

115. As a direct and proximate result of Defendant's actions, Ms. Prettyman has suffered and continues to suffer emotional distress and physical injury. Such injury includes

26

pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, depression, anxiety, stress, fearfulness, stress and anxiety related to not being able to earn a living or find comparable employment in her chosen field, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

116.    Due to the severity of Defendant's conduct, Ms. Prettyman is also entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TERRI M. PRETTYMAN requests that this Court enter judgment in her favor, and against Defendant LTF CLUB OPERATIONS COMPANY, INC. d/b/a LIFE TIME FITNESS, on the above stated Counts; and further:

(a)    Award Ms. Prettyman appropriate front pay and back pay, benefits, pecuniary losses, pre-judgment interest, and post-judgment interest on Counts One and Three; and in addition

(b)    Award Ms. Prettyman liquidated damages on Counts One and Three; and in addition

(c)    Award Ms. Prettyman compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on the above-stated Counts One, Two, Three and Four; and in addition

(d)      Award Ms. Prettyman punitive damages on Counts Two and Four in the amount

of three hundred and fifty thousand dollars ($350,000) (the statutory cap in Virginia); and in

addition

(e)      Award Ms. Prettyman' attorneys' fees and the costs of this action; and in addition

(f)      Award injunctive relief consisting of an order prohibiting Defendants from

engaging in further employment practices that create or tolerate a discriminatory work

environment; and in addition

(g)      Award Ms. Prettyman reinstatement with all back pay and benefits and interest;

and

(h)      Award Ms. Prettyman such other and further relief as may be appropriate under

the circumstances.

## JURY DEMAND

PLAINTIFF TERRI M. PRETTYMAN DEMANDS A TRIAL BY JURY.


February 2, 2018                              Respectfully submitted,


                                             */S/ CARLA D. BROWN*

                                             Carla D. Brown
                                             Virginia Bar No. 44803
                                             cbrown@cbcblaw.com
                                             CHARLSON BREDEHOFT
                                               COHEN &  BROWN, P.C.
                                             11260 Roger Bacon Drive, Suite 201
                                             Reston, Virginia 20190
                                             (703) 318-6800  Telephone
                                             (703) 318-6808  Facsimile

                                             *Counsel for Plaintiff, Terri M. Prettyman*


28